United States Court of Appeals for the Ninth Circuit is now in session. Good morning and welcome to all counsel. We have a number of matters to submit before we get to our one argued case for the day. They are Zamora Morado v. Bondi, Morales Ocampo v. Bondi, Chapa Martinez v. Bondi, and Emanuel Atanda v. Norgren has been stayed pending settlement. So we have our argued case of the day, which is Malheur Forest Fairness Coalition v. Iron Triangle, LLC. And I believe that Mr. Haglund is up first. Is that correct? Yes, your honor. That's right. All right. Please proceed. May it please the court. I'm Mike Haglund of Haglund Kelley in Portland representing the plaintiff's appellants. I will reserve five minutes for rebuttal. Try to keep your on the clock there. In this antitrust case where the district court accepted the geographically distinct product market area alleged in the complaint and defendant Iron Triangle held 90% or more shares in each of the four log related relevant product markets alleged in the complaint, the district court made three incorrect rulings. First, in connection with defendant's first motion to dismiss, the district court dismissed with prejudice plaintiff's monopolization claims related to the stewardship services and harvest rights markets on the clearly incorrect ground that these two markets by regulation were exempt from antitrust scrutiny. As the district as the Department of Justice amicus brief makes clear, neither regulation cited by the district court precluded the government from accepting super competitive prices for stewardship services sold to it by Iron Triangle, nor did it prevent the Forest Service from being deceived by defendants manipulation of log prices used in the government appraisals for selling timber. Let's say that we agree with you and the government that there was a misstep there in terms of the district court's analysis, you still have to plead monopoly power given that market share is not synonymous with monopoly power as substantial as it may be. What is your best argument that there's monopoly power here or that there are substantial entries to competition or barrier by other players in the marketplace? With respect to monopoly power, we did enhance our allegations between the first amended complaint and the second amended complaint. The barriers to entry were we had multiple paragraphs. I'm working with the second amended complaint. I missed the question, Judge. What were those enhanced allegations between the first and second amended complaint? For example, the fact that log markets where the government owns the bulk of the forest land in a given relevant geographic area, the markets are inherently inelastic. That is a barrier to entry that was recognized in the Ninth Circuit case in the Weyerhaeuser litigation. The barriers to entry also include the very substantial investment necessary to carry out logging and stewardship services. The size of Iron Triangle's share of 90% in each of these four markets is itself a major barrier to entry. The mobilization costs. Wouldn't anyone enter the market face the same initial startup cost? Why is that a factor that should weigh into our analysis? It's a factor because Iron Triangle's market share was so monstrous at 90% and because of the tying arrangement itself was a major barrier to entry because it had an extraordinarily pernicious effect on the market. Because with Malheur Lumber Company, the co-defendant, being unwilling to purchase pine saw logs from any other supplier other than Iron Triangle for logs produced in the market area, that foreclosed private landowners like the two ranchers we represent from being able to harvest any of their private timber because the stands in this area are all mixed stands of both fir and pine species. And you can't effectively, from an economic perspective, harvest your own property for fire hardening reasons, which is what thinning and other stewardship services will do, or for commercial logging where you don't have an outlet for your pine. And that likewise created a major barrier to entry for the four or the we represent in this case four logger plaintiffs. Each one of has the capability of bidding on timber sales, the minimal amount of those that were outside of the stewardship contract, which covered 90% of the total timber sale program for a 10 year time frame or the total volume harvested. The lack of a pine outlet puts you in a position where you really have a monster disincentive to bidding on those contracts and the private opportunities are foreclosed because you don't have a home for the pine logs and you'll lose money sending them a couple hundred miles beyond where this out this close in outlet is located. I'm sorry to interrupt you. Your time is limited. So I just want to make sure I understand this point of your argument. Going back to Judge Thomas's question on the cost of mobilizing equipment and initial capital costs, you're not saying that the defendant has any kind of cheaper costs in terms of equipment, but that it's not worth it for other people to basically make the investment because their share of the market, even assuming the engine would be so small. In other words, there's an economic disincentive to compete. Yes, it is. And that's especially so where the operator that would be going into that location knows that they've got no sales outlet for the pine resource, which is one of the two major species harvested in all those locations. I want to go back a little bit. My colleagues have raised this question in a general sense, but this is a kind of a unique situation. You've got an exclusive government contract. Almost all the trust cases we deal with involve private parties, and we don't have that here. And I'd be interested in your best case that an exclusive government contract can be the basis of a Section 2 violation. Have you pledged such a case? Yes, Your Honor, I have. I was lead counsel for the plaintiffs in the Weyerhaeuser case that was handed down by the Supreme Court in 2007 and established the predatory bidding test for log markets. And from your perspective, that satisfies the requirement of an exclusive government contract? No, that case was different. That was all private plaintiffs and private defendants. That's what I struggle with. If you were talking about private parties here, you'd have a very different situation. But here you have the government saying to everybody interested, hey, we've got this potential contract, come and bid on it. But they're the buyer. I mean, they control pretty much the whole thing. They set it up. You're unhappy, of course, with the Iron Triangle people because you feel that they weren't sharing as you think they should. But I think we can't forget the nature of the contractual status of this whole matter. I don't find any case that allows you to plead a Section 2 violation given the fact that the government is the buyer and contracting party. Well, Your Honor, Judge Smith, a parallel case is the Reed Brothers case. The Reed Brothers case that came down, was litigated by then private lawyer Bill Dwyer, then ultimately Judge Dwyer. That was a case where one of the core allegations was that two companies that were granted 50-year contracts for specific large zones on the Tongass National Forest in Alaska had used the power that they got from those contracts in combination with other anti-competitive tactics, just like we have here, to achieve monopoly positions and to also, the two of them engaged in Section 1 conspiracy to further constrain trade. The plaintiff loggers in that case won a significant verdict that was ultimately affirmed in its entirety by the Ninth Circuit. The government was the seller in that instance, but it was a parallel situation where a key ingredient to how they got to monopoly power was these two exclusive huge 50-year contracts. Okay, so you believe that the length of those contracts is analogous to the government's involvement in this case? Absolutely, yeah. Let me just make a note to our professional help. Kwame, I can see no clock here on my screen. Can you be sure and put one here so I can help keep track of this? Jim Smith, I see it. I can see it and there's 517 left right now. Okay, I don't see it. Anyway, Kwame, I'm missing it on my end. Okay, Judge, you might want to just expand. Are you seeing full screen on your... Yes, let's see. Hold on a second here. And then if you click on view and go to gallery, that might help. Let's see. View, I'm not seeing that either. Upper right-hand corner, you should see a view button. Oh, got it. Okay, I see it now. Okay, thank you. Pardon me. So, counsel, you've got a little over five minutes left. Do you want to save any of your time for rebuttal or do you want to move forward? I want to just make one quick point before I take the rest of my time and that would be one of the big problems in terms of error below is that with respect to the monopoly power and anti-competitive tactics claims, there was some criticism of the allegations in a 40-some page complaint. We enhanced those in the second amendment complaint and then the court may nonetheless dismiss those claims, making no reference to these substantially enhanced allegations. A good example is the predatory bidding allegations in the first amendment complaint. We alleged what the two predatory bid timber sales were, claimed that losses had been occurred, criticized that those were two conclusory, doubled the number of paragraphs of three to six in the second amendment complaint, and not only alleged the timber sales involved but gave estimated amounts by which there were losses on each of those sales in terms of hundreds of thousands of dollars with specific numbers. And then we also added a paragraph explaining how those losses could be cooped. None of that was addressed. So you strongly disagree with the district court's Iqbal analysis, is that right? Yes, we do and I'll reserve the balance of my time, your honor. Very well, okay. So for Iron Triangle, I believe that Mr. Schneider is up first. Thank you, your honor. May it please the court, I'm going to take 11 minutes and reserve four minutes for Malheur-Lumber's counsel. Okay. The district court in this case correctly dismissed this lawsuit with prejudice because despite multiple opportunities at the trial court level, the plaintiffs were never able to plausibly allege all of the elements of a violation of either section one or section two of the Sherman Act. They failed to plausibly allege that Iron Triangle possessed monopoly power in any of the four alleged markets. They failed to plausibly allege facts showing anti-competitive conduct or section one violation agreement. And each group of plaintiffs failed to plausibly allege an injury to them, an antitrust injury resulting more broadly from an injury to competition. I think I'll start by talking about monopoly power and follow up on Judge Nguyen's point. To plead monopoly power with circumstantial evidence, you need both a high market share and significant barriers to entry and expansion. And those are additional long-run costs that the new entrant or the other competitor must incur that the incumbent doesn't have to incur. And that's simply not alleged in this case. And so what the plaintiffs do is they say, well, the anti-competitive conduct, if you look at the reply, they say the anti-competitive conduct collapses into, becomes the barrier to entry. But as we pointed out in our briefing, they don't plausibly allege anti-competitive conduct. And I want to talk about the one barrier to entry that is emphasized over and over again. And that's the supply agreement between Iron Triangle and Mouthier Lumber. The district court found that the plaintiffs had not plausibly alleged that that agreement foreclosed competition because the plaintiffs could not, did not have an outlet for one of the species in these forests, which is the pine saw logs. And the reason the district court rejected that is plaintiff's own allegations in the complaint undermined their claim that they were foreclosed. And I would point out, this is very similar to judge, to an opinion offered, authored by Judge Smith in Summers versus Apple, where this court affirmed dismissal and antitrust complaint when the plaintiff's theory was quote, implausible in the face of contradictory market facts alleged. And so that is this case. There are two sawmills alleged to be in this geographic market. For Mouthier Lumber, the plaintiffs allege that Mouthier Lumber offers to purchase pine from Iron Triangle's competitors at prices that cover the cost of logging and that cover the cost of transportation. That is not market foreclosure. Moreover, the complaint alleges that the other, the plaintiff Prairie Wood purchases and processes pine saw logs. Now, that's also not market foreclosure. Both mills in this market are alleged to be available to purchase pine and fir from market participants. Now, Prairie Wood contends that it loses money. If you just look at that market of pine, they lose money on pine. Presumably they don't lose money on fir, but they lose money on pine. But this isn't a pine market that is alleged. And all that says is that Prairie Wood, for whatever reason, is an inefficient producer. But that doesn't allege market foreclosure. So there are no barriers to entry in this market or any of the markets that the district court rightly observed. What about counsel's point that assuming that they have essentially a sliver of the market, the high capital costs and costs of mobilizing equipment such that economically it just wouldn't be viable. Well, let's say the defendant controls. I know that's not this case, but hypothetically, 99% of the market. Can the high cost of essentially producing lumber ever establish a monopoly? Well, I mean, we got to look at the allegations in this case. Okay. So the entry barriers are no different than what Iron Triangle or any other logging company has to do. You got to know how to log. You got to have saws. You got to have trucks. And simply because Iron Triangle has high market share, that alone is not indicative of monopoly power because nothing prevents. In fact, Rude Logging is alleged to have been doing subcontracting until they didn't like the prices that Iron Triangle was offering them in this market. And they all contend that they're ready, willing, and able to hop into this market and buy harvest rights and do all the work, but they don't have an outlet for pine. They're not contending that they can't mobilize, that they're unprepared to compete. They're just saying, um, we don't have an outlet for pine. And our point is that that's not what the complaint actually alleges. There's no foreclosure here. And that's the fundamental problem, we believe, with using this supply agreement as both the monopoly power barrier to entry and anti-competitive conduct. It just doesn't work. And in your view, the misrepresentation allegations don't suffice because they still have to meet 9b's heightened pleading requirements? Yes, that's definitely, that's what the district court disregarded the misrepresentation allegations for that reason. But I would add two more reasons why those could be disregarded. One, the misrepresentations that are alleged to have been made to the Forest Service within the stewardship contract, that didn't change competition at all. It just didn't change the competitive landscape. So there's no connection between a false statement to the government, maybe the government has a claim that that in fact happened, but there's no connection between that and an injury to the competitive landscape. And I'd also point to our citation to session tank liners on the Knorr-Pennington doctrine. This court's been very clear that allegations that a competitor went to the government, asked for something, and got that something from the government is not the basis for an antitrust claim, even if what they got was the product of a false statement. So there's multiple reasons we would submit why the false statements just don't connect up into an antitrust violation. I guess with my last couple minutes, I want to address something that we didn't have the chance to address in our brief, which is antitrust injury. The plaintiffs went to that element and addressed it on their reply. And to plead antitrust injury, among other things, the plaintiffs had to plead an injury of the type the antitrust laws were intended to prevent that flows from that which makes the defendants acts unlawful. And so if you go through each plaintiff quickly, you can see why that doesn't work for them. So the lager plaintiffs say, well, we suffered injury because we were a victim of a predatory bidding scheme. We've pointed out in our briefing why they haven't plausibly alleged that. And fundamentally, despite the enhancements Mr. Hagelin put into the amended complaint, he never alleges a predatory bid. He says the value of the timber at the time it was purchased was less than the bid. But that's not the Weyerhaeuser analysis. For there to be a predatory bid, the revenue earned ultimately has to be less than the cost. And that's the missing allegation here. And as the Weyerhaeuser court explained, sometimes people bid high as a hedge because they believe that costs are going to go up. So that's why you don't look at the value at the time of the bid, you look at the revenue. But assuming he pled that, the plaintiffs, four of them, four of the lagers don't allege they even participated in these bids. So you can set them aside. And the one who does claim to have participated in the bid doesn't allege that he was or that it was the next highest bidder. They just say they're one of the highest bidders. So counsel, as you as you point out, these issues were not addressed in your friend's opening brief. So I mean, should we even be entertaining them at this point? Well, you certainly could choose not to. They were an alternative basis for the district court's ruling on two of the markets. The district court did not in its second dismissal motion reach the trust injury issue. And so I'm not confident if that was a waiver by Mr. Hagelin, not raising it in his opening brief. We argued certain things he didn't raise were waived. And it's kind of a detailed analysis on argument by argument in our briefing. But I would just say that even if you skipped over, skipped over that and looked at antitrust injury, it's just not it's just not there. And I gave I gave that one example. I guess the other example I would give is all the participants, the landowners, the loggers in the mill say that their injury is because they can't sell pine to Malheur lumber, because Iron Triangle is selling pine to Malheur lumber. And that's just another way of saying they're foreclosed from the market. And just like the Summers case that I've earlier, that's contradicted by their factual allegations that undermine this foreclosure theory. And so that's not plausibly alleged. So unless there's further questions, I would ask that this court for any of these reasons, or all of these reasons affirm dismissal. Thank you. Any questions by my colleagues? No, thank you. I think not. So Mr. Peterson, you have four minutes. Thank you. Good morning, Your Honors. May it please the court Dan Pearson for defendant Malheur lumber company. There's a single claim against Malheur lumber company in this case. And that's the section one claim that Malheur and Iron Triangle engaged in a conspiracy to restrain trade by entering into the alleged tying agreement. The district court properly dismissed this claim two times. And there's no basis for this court to reverse that decision. Now a lot of the issues overlap. So I'm going to try not to plow the same ground that Mr. Snyder already covered. But you know, the most important issue from our perspective with respect to the tie and the tie at issue that we're talking about is the sale of pine logs, the tying product to the purchase of logging services, the tied product. And one of the key things that they need to allege and ultimately prove that appellants need to do is that there are two separate and distinct products. In this case, they argue that the softwood saw logs and logging services are two distinct markets. The court of the district court disagreed with that position. And the key element in determining in that decision is determining from whose perspective the court should analyze the issue. And under Jefferson Parish with further articulation in the Rick Mick case, the case law is clear that it's the view from the purchaser's vantage point that matters with respect to the two distinct products. So with that, the question is, what is Malheur Lumber buying? And the answer to that question is saw logs. Here the saw logs and the logging services that appellants propose are two distinct markets are inextricably linked because obtaining saw logs, which is what my client needs, necessarily requires logging trees. Malheur Lumber needs its saw logs and it has no need for logging services outside of its need to acquire saw logs. And so in our briefing, we cover several examples of instances where in fact you would have related products like this that would be distinct. And Eastman Kodak is instructive on that point. The court found distinct products in that case where you had parts and you had service. And the court decided that some purchasers might need parts, but if they're self-servicers, they wouldn't need products. And likewise, some consumers might need service. But if that service didn't require products, then you could separate those two things, parts and services into two distinct categories. Here we don't have that because again, there's no need for Malheur Lumber to have logging services other than its need to get logs. And again, despite some argument in the briefing by appellants, it's not, it's the purchasers, it's Malheur Lumber's perspective that matters. And appellants state in their brief that logging services and softwood saw logs are decidedly different products from Iron Triangle's vantage point and that of its rival loggers. But that argument is not relevant to the position here. And so it is Malheur Lumber's position that the arguments in appellant's brief and their allegations and the complaint fail to allege a per se tying agreement and that the district court's decision on the tying issue, the section one issue should be affirmed. Very well. Other questions by my colleagues from Mr. Peterson? No, thank you. Very well. All right, Mr. Hogman, you've got a little rebuttal time. Yes, I'd like to respond very briefly to several of the points made by Mr. Snyder. He claimed that we had no allegations regarding market foreclosure as it pertained to the tying arrangement. But if you look at the second amended complaint, paragraph 48, we specifically state that the logging service competitors, the loggers have been effectively foreclosed from the opportunity to compete with Iron Triangle in the logging service and softwood saw log markets. And we go on to detail that. He also claimed that we did not allege the loss that would be suffered on the predatorily bid timber sales. Looking at paragraph 52, which covered one of those, we actually state that they paid X and it would have generated a loss on that timber sale of $530,000. We clearly meet the Weyerhaeuser test for predatory bidding in our allegations that need to be assumed to be true. The antitrust injury, we allege antitrust injury for each of our categories of plaintiff clients. With respect to the landowners, we note, and I'm referring to paragraph 81, that as a result of the anti-competitive tactics that are alleged above, the individuals who operate the Emil Brothers Ranch and the other, the Voight family that have the Rico Ranch have suffered lost profits in the form of foregone timber revenues on dead or dying timber that is now not marketable because they have no outlet for the pine rendering timber harvest on their property, uneconomic because you've got to have both categories of major species with viable outlets for them. The counsel, let me just say this. I, to me, one of the weakest points of your argument is the antitrust injury issue. What's your best argument that iron triangles behavior has been harmful to consumers, which of course is the key in antitrust injury. I don't find much of a pleading on that. What's your response? Well, this is a monopsony case largely, and we're ultimately dealing with natural resources markets where it's the buyers who are being disadvantaged as opposed to a seller's market where it's a monopolization case is focused on consumers. A monopsony case is focused on buyers, and that's an important thing to recognize. The Weyerhaeuser case was the first time that the Supreme Court made clear that there were some dicta, but that's the case where the United States Supreme Court held unequivocally that the buy side of the economy is subject to the same antitrust legal requirements that industries selling cigarettes or other products must comply with in a monopolization case. Ultimately, if the district court had been true to the standard that you've got to look at the allegations in the complaint, treat them as true, and draw all reasonable inferences from them, I think we sail easily over the Iqbal bar, and these issues that are raised by the defendants, they're going to get a chance to raise them on summary judgment after we've got discovery, and we were barred from any during the two years that this case was pending. So from your perspective, monopsony is what saves you in the antitrust injury category, is that correct? Yes. Okay, I think your time is up. Any other questions by my colleagues? No, thanks. I don't have any. Thank you. Thanks to all counsel in this interesting case. The case of Malheur Forest Fairness Coalition versus Iron Triangle LLC is submitted, and the court stands adjourned for the day. Thank you, your honors. Thank you, your honors. This court stands adjourned. Thank you.
judges: SMITH, NGUYEN, THOMAS